CASUALTY UNDERWRITERS v. LEMONS et al.

No. 13652.

Court of Civil Appeals of Texas.
Fort Worth.

Jan. 28, 1938.

Rehearing Denied March 4, 1938.

Donald, Kearby & Donald, of Bowie, and Touchstone, Wight, Gormley & Price, of Dallas, for plaintiff in error.

Bruce Greenwood and Taylor, Muse & Taylor, all of Wichita Falls, for defendants in error.

BROWN, Justice.

This is a workmen's compensation case, brought by defendants in error, who will be designated hereinafter as appellees, against plaintiff in error, who will be designated as appellant.

The case was tried to a jury, and eleven special issues submitted for determination.

Issue No. 1 reads as follows: "Do you find from a preponderance of the evidence that Martin Eugene Lemons sustained a personal injury on or about the 27th day of December, 1935?" The jury answered "Yes."

Issue No. 2 required the jury to find whether or not the injury sustained was one had in the course of Lemons' employment. The jury answered "Yes."

Issue No. 3 required the jury to find whether or not such injury was the cause of the death of Lemons. The jury answered "Yes."

Issue No. 4 required the jury to find what was the average daily wage of an employee of the same class, who performed the same or similar work to that in which Lemons was engaged during substantially a whole year prior to the date of Lemons' death. The jury answered $2.50.

Issue No. 5 required the jury to find whether or not the payment to Mrs. Lemons, the surviving wife, of the compensation due her in weekly installments would result in manifest hardship and injustice to her. The jury answered "Yes."

Issues Nos. 6, 7, 8, 9, and 10 required the jury to find whether or not the payment of compensation due the five surviving children in weekly installments would result in manifest hardship and injustice to the children, and the jury answered, as to each separate child, "No."

Issue No. 11 required the jury to find whether or not the death of Lemons was caused solely by disease unrelated to his work, and the jury answered "No."

On this verdict, judgment was duly entered for the surviving widow, awarding her one-half of the compensation thus found, in a lump sum, and awarding the said children one-half, to be paid in installments.

■ Recovery was sought by these appellees on the theory that the employee, Lemons, died from monoxide gas poison. It was Lemons' duty to go to the oil field operated by his employers, on which there were producing wells, and to take a truck furnished him by the employers and station it at a certain place on the lease; then jack up one of the rear wheels and connect same by a belt with a pump' and run this pump. All of this was out in the open air, but there was a cab on the truck that was partially inclosed.

The testimony showed that there were holes in the floorboards of the truck, and a defect in the exhaust pipe connected to the gasoline engine which operated the truck, and that it was possible for the gases escaping from the running engine to come up through the openings in the floor boards and into the cab, where the driver of the truck must sit.

The proof further showed that the glass behind the driver's seat was broken. The proof further showed that the gasoline used in the truck was of a grade and type that would produce monoxide gas readily.

To further make out a prima facie case, under the allegations, the appellees introduced testimony showing that there was a cold, damp wind blowing on the morning that Lemons died; that there was no shelter for Lemons, except the cab of this truck, and the testimony showed that on the morning Lemons died, he was seen sitting in the cab of the truck while the engine was running. Lemons was found dead, or practically dead, lying prone on his face, several feet from the truck, but it was also established that the ignition switch on the truck had been cut off, and the belt connecting the truck wheel and the pump had been removed, and the valve on the pump had also been cut off. Thus, it appears that if Lemons did inhale monoxide gas in sufficient quantities to affect or injure him, he must have got out of the cab of the truck, turned off the ignition switch, removed the belt connecting the truck wheel with the pump, and shut off the valve on the pump before he collapsed.

It is the theory of appellant that Lemons died from heart disease, and not from monoxide gas poisoning.

A physician was found as soon as possible, and his testimony concerning the appearance of the body, both as to its exterior and as to the mucous membranes within the mouth, was to the effect that the discoloration was not such as the medical authorities contend is found on and in persons who suffer from monoxide gas poisoning. Furthermore, this physician held an autopsy on the body of the deceased, and testified to having found an enlarged heart, and that the color of the blood in the deceased's body was not such as the medical authorities contend is the color found in the blood of one suffering from monoxide gas poisoning. This physician further testified that he took a specimen of the blood from near the heart of the deceased, and out of the aorta, and placed this in a glass tube, sealed it with a cork stopper, and sent it to a physician in Wichita Falls, Tex., who conducted a laboratory examination. The physician who examined the blood testified that it did not bear the color of the blood of one who has suffered from monoxide gas poisoning, and he further testified to having made two well-known and approved laboratory tests, and that neither test showed the presence of monoxide gas. It was further testified to that one of these tests was such that even a very small portion of monoxide gas present in the blood would be disclosed, and this expert medical testimony further disclosed that death from monoxide gas poisoning is caused by a very much larger per cent. of monoxide gas than this particular test is capable of discovering.

To meet the expert testimony of the attending physician and the physician who conducted the blood test, appellees introduced a lay witness who saw the deceased's body at the place where he died, and who assisted in giving the deceased artificial respiration, and this witness' testimony did not coincide perfectly with the testimony of the attending physician.

The appellees also introduced testimony from a physician who neither saw the body of the deceased nor examined the specimen of his blood. This physician admitted that one of the laboratory tests made of the deceased's blood was considered as accurate and thorough as any test that can be made, excepting that of a spectroscopic test. It was admitted that the latter test was not made, because there was no spectroscope available. This expert witness introduced by the appellees testified from hypothetical questions only. The substance of his testimony is that any and all of the laboratory tests made are not infallible, and that Lemons could have died from carbon monoxide poisoning, even though these tests failed to disclose the presence of such poisonous gas.

He further testified that from the evidence given by the layman who testified. concerning the appearance of the deceased's skin and mucous membranes in his mouth, and even from the testimony given by the attending physician concerning the appearance of Lemons' body and such mucous membranes, that in his opinion Lemons died from monoxide gas poisoning. In short, this expert. witness introduced by appellees testified that one who dies from monoxide gas poisoning would not have the pinkish or cherry red cast on his skin and in the mucous membranes of his mouth and throat and in his blood so long as an hour after he had died.

The testimony of the experts introduced by the appellant was that the medical authorities hold absolutely to the contrary, and that the blood will retain its peculiar tint for even months after death, and that the peculiar pink cast of the skin will continue for so long a time after a person has died from monoxide poisoning that an ordinary layman looking upon him will think that he is alive.

On this state of facts, appellant presents its first assignment of error, which complains that the trial court erred in refusing to give it a peremptory instruction.

We are frank to say that we do not know how far a trial court or an appellate court within the state of Texas may be permitted to go, under such circumstances. It would appear that in many cases, in fact in practically all of them, expert medical testimony is not considered conclusive, and that mere laymen serving on juries have a right to disregard this testimony and reach conclusions in such a situation as confronts us.

Some of us on this court have very decided convictions concerning expert testimony, under circumstances such as surround this case, but in view of the liberal trend of decisions in this state, we overrule the first assignment of error.

See Texas Employers' Insurance Association v. Ford et al., Tex.Civ.App., 93 S.W.2d 227, in which a writ was dismissed by the Supreme Court, and our conclusions, spoken by the Chief Justice of this court, constituted the only. assignment of error presented to the Supreme Court. In that case, we discussed rather fully the relative values of expert testimony.

We shall omit passing upon the second, third, and fourth assignments of error, which complain of the overruling of appellant's motion for a new trial, because the answers returned by the jury to special issues Nos. 1, 2, and 3 are contrary to the overwhelming preponderance of the evidence, and proceed to discuss the fifth assignment of error, which complains of the trial court overruling appellant's objection to special issue No. 1, quoted above. This issue, as has been shown, simply asks the jury to find whether or not Lemons sustained a personal injury on the occasion in question, and the objection urged against the issue is that it is vague, indefinite, and uncertain, and fails to confine the jury to a consideration of the character of injury raised by the pleadings, and is so general that it permits the jury to speculate on matters outside of the realm of the plaintiff's pleadings and of the evidence introduced. We believe that this assignment of error is well taken.

In Security Mutual Casualty Co. v. Bolten et al., 84 S.W.2d 552, Mr. Chief Justice Dunklin, speaking for this court, condemned a similar charge.

We are committed to the proposition that plaintiff must recover upon the cause of action alleged in his pleadings, and that he must prove the truth of those allegations. We do not believe it is a sufficient answer to this assignment of error to simply say that only one injury was alleged, and that because of this fact the submission of special issue No. 1 in general terms was sufficient, when properly excepted to.

The sixth, seventh, eighth, and ninth assignments of error have to do with the submission of the issue of the weekly wage that should be applied to this case, and the judgment rendered thereon, and inasmuch as these matters will in all probability be properly handled in another trial, we do not feel the necessity of expressing an opinion on the assignments of error.

For the reasons given, the judgment of the trial court is reversed and the cause is remanded for a new trial.